# In the United States Court of Federal Claims

No. 21-1469
Filed: October 7, 2021
Reissued: October 21, 2021[1]

|  |  |
|---|---|
| PAE AVIATION & TECHNICAL SERVICES, LLC, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) ) |
| Defendant, | ) ) ) |
| and | ) ) ) |
| DYNCORP INTERNATIONAL, LLC, | ) ) ) |
| Defendant-Intervenor. | ) ) ) ) |

**OPINION AND ORDER**

*Robert Stephen Nichols*, Nichols Liu, LLP, Washington, DC, for plaintiff.

*Kelly Krystyniak*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*Scott Michael McCaleb*, Wiley Rein, LLP, Washington, DC, for defendant-intervenor.

**SMITH, Senior Judge**

      This action is before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, PAE Aviation and Technical Services LLC ("PAE"), challenges the U.S. Customs and Border Protection ("CBP" or "Agency" or "Government") award decision under Request for Proposals, No. 70B02C18R00000063 ("RFP" or "Solicitation"). *See generally* Complaint, ECF No. 1 [hereinafter Compl.]. Specifically, PAE challenges the Agency's evaluation of the following: (1) PAE's proposal regarding its planned labor efficiencies and its Cost Proposal, and (2) Dyncorp International, LLC's ("Dyncorp") change in corporate ownership. *Id.* Additionally, plaintiff asserts that the Agency failed to

---

[1] An unredacted version of this opinion was issued under seal on October 7, 2021. The parties were given an opportunity to propose redactions, and those redactions are included herein.

amend the Solicitation to reflect current operational requirements and failed to conduct a best value determination. *Id*. at 21–22; 25–26.[2]

In response, defendant contends that the Agency properly (1) assigned PAE a weakness for its reduction in aircraft mechanic and aircraft mechanic supervisor labor, (2) rejected PAE's proposed escalation rates, (3) considered DynCorp's ownership change, (4) conducted a best value determination, and (5) determined its requirements without need for an amendment. *See generally* Defendant's Cross-Motion for Judgment on the Administrative Record, and Opposition to Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 60 [hereinafter Def.'s CMJAR]. Similarly, defendant-intervenor argues that the Agency conducted a proper evaluation and was not required to amend the Solicitation. Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 61 [hereinafter Def.-Int.'s CMJAR]. For the reasons set forth below, the Court denies PAE's Motion for Judgment on the Administrative Record and grants defendant's and defendant-intervenor's Cross-Motions for Judgment on the Administrative Record.

### I.     Background

The U.S. Customs and Border Protection is responsible for "protecting our Nation's borders in order to prevent terrorists and terrorist weapons from entering the U.S.; apprehending individuals attempting to enter the U.S. illegally; and stemming the flow of drugs and other contraband while facilitating the flow of legitimate trade and travel." Administrative Record 123 [hereinafter AR]. To achieve this purpose, the Agency conducts aviation enforcement by "utiliz[ing] a diverse fleet of fixed-wing and rotary-wing aircraft" for "interdiction, investigation, domain awareness, and contingency operations and national taskings." *See* AR 123. To keep the aviation fleet operational, the Agency's Air and Marine Operations "requires continuous aviation maintenance and logistics support services at its various operating sites." AR 123.

#### A.     The Solicitation

On June 1, 2018, the Agency released its Solicitation to procure aircraft maintenance and logistics support, through the Federal Business Opportunities website. AR 23. The Agency sought to award the National Aviation Maintenance and Logistics Services ("NAMLS") contract to service 211 aircrafts at 34 locations classified as Aviation Operational Sites ("AOS"). AR 29; AR 123. The Agency contemplated a period of performance of one base year and nine option years with a three-month option extension, totaling over ten years of performance. *See* AR 1193–1214 (Amendment 12). Each year, the Solicitation provides for seven contract line items ("CLINs") with firm-fixed price, cost-plus incentive fee, and cost reimbursement CLINs. *See* AR 1193–1214. The Solicitation instructed offerors that the Agency would select the proposal that offers the best value to the Government using the trade-off process. AR 29.

---

[2] Plaintiff has withdrawn Counts 1 and 4 of its Complaint. Plaintiff's Motion for Judgment on the Administrative Record, at 1 n.1. Count 7 has been dismissed. *Id*.; *see generally* Order on Motion to Dismiss, ECF No. 56.

Offerors were required to submit two volumes: (1) Business Management Information: Cost/Price ("Cost Price Proposal") and (2) Technical/Technical Management ("Technical Proposal"). AR 300. For the Cost Price Proposal, offerors were required to submit financial and labor pricing information under Attachments 6A, 6B, 6C, and 8. AR 301–02 (Amendment 3). Within Attachments 6A and 6B, the Agency provided a table for offerors to include detailed labor information such as labor categories, labor hours, number of employees, and labor rates. AR 1172 (Amendment 10); AR 1216–24 (Amendment 12). Offerors were required to "determine the escalation factor(s) applicable to their estimate for each option[] period." AR 1147 (Amendment 10). The Agency specifically noted that it will "evaluate proposed escalation rates for reasonableness in comparison to industry contract escalation standards and the rationale provided to support the proposed rates." AR 1225 (Amendment 12). Importantly, the Agency instructed offerors to explain "any proposed escalation rates that are below historical wage escalation levels or any unique circumstances involving the proposed escalation rates." AR 1225.

For the Technical Proposal, offerors were instructed to provide a "sufficiently specific, detailed, and complete" proposal which would "demonstrate that the offeror has a thorough understanding of the requirements set forth in the solicitation." AR 303. In making the award, the Agency would evaluate the following factors within the Technical Proposal: Factor 1 (Technical); Factor 2 (Safety); Factor 3 (Past Performance); and Factor 4 (Cost/Price). AR 113–16. In terms of relative importance, Factors 1 through 3 were listed in order of their importance with Factor 1 (Technical) being significantly more important than Factors 2 (Safety) and 3 (Past Performance). AR 117. Factors 1 through 3 combined were significantly more important than Factor 4 (Cost/Price). AR 117.

Each factor, except Factor 4 (Cost/Price), would be assessed for individual Significant Strengths, Strengths, Significant Weaknesses, Weaknesses, and Risks. AR 115. Additionally, these factors would be assessed a Risk Rating of Low, Medium, or High based on whether the offeror's proposal contained risk with "little or no potential," some potential, or was "likely to cause significant serious disruption of schedule, increase in cost, or degradation of performance." AR 115. Based on these identified strengths, weaknesses, and risks, the Agency would assign a Consensus Rating of High Confidence, Confidence, or Low Confidence regarding the offeror's ability to perform the requirements of the Solicitation. AR 115–16.

Important to this protest is the evaluation of Factor 1 (Technical) and Factor 4 (Cost/Price). Within Factor 1 (Technical), the Agency evaluated two sub-factors: Subfactor 1 (Maintenance Capacity) and Subfactor 2 (Maintenance Capability Processes and Facilities). AR 113–14. Under Maintenance Capacity, the Agency instructed offerors to complete Attachment 8, a standardized workforce template, to provide a detailed workforce breakdown of Program Management Office personnel and site maintenance personnel at each AOS location. AR 113. As to Factor 4 (Cost/Price), the Agency instructed offerors that it would conduct a cost realism analysis in accordance with Federal Acquisition Regulation ("FAR") 15.404-1 to determine the most probable cost for each offeror. AR 114–15.

### B.     Evaluation and Award

After the Agency received initial proposals and conducted discussions, it received final proposal revisions ("FPRs") by January 11, 2019. Compl. at 6. The Agency awarded to DynCorp International, LLC ("DynCorp") after which PAE and another offeror, Vertex, challenged the award at the Government Accountability Office ("GAO"). *Id*.; *see* B-417704.1-.2. On July 8, 2019, the Agency voluntarily took corrective action. Compl. at 7. Plaintiff was not satisfied with the scope of the Agency's corrective action, which lead to an agency-level protest and eventually another GAO protest. *See id*.; *see also* B-417704.4. On September 5, 2019, the Agency again took corrective action and allowed offerors to resubmit their FPRs. Compl. at 7. On December 5, 2019, offerors submitted their FPRs. *Id*.

On May 15, 2020, the Agency awarded to PAE. Compl. at 8. On June 22, 2020, DynCorp filed a protest at GAO. *See* B-417704.6. On July 10, 2020, the Agency took corrective action. Compl. at 8. On July 22, 2020, the Technical Evaluation Team ("TET") and the Cost Evaluation Team ("CET") re-evaluated the December 5th FPRs. AR 4. On August 5, 2020, the TET provided labor hour adjustments to PAE's proposed labor hours for option years three through nine ("OY 3-9"). AR 4. On December 16, 2020, the Source Selection Authority ("SSA") was briefed on the evaluation findings. *See generally* AR 3323–60.

The evaluation ratings for PAE and DynCorp are the following:

| Offeror | Factor 1: Technical | Factor 2: Safety | Factor 3: Past Performance | Factor 4: Most Probable Cost |
|---|---|---|---|---|
| DynCorp | High Confidence/ Low Risk | High Confidence/ Low Risk | High Confidence/ Low Risk | $1,393,488,097 |
| PAE | Confidence/ Medium Risk | High Confidence/ Low Risk | High Confidence/ Low Risk | $1,357,585,550 |

AR 3466. During this time, the Agency conducted a due diligence check of DynCorp and learned that DynCorp had been acquired by Amentum Services, Inc ("Amentum"). AR 4. The procurement team noted that DynCorp was still registered in the System for Award Management ("SAM") with the same Data Universal Numbering System ("DUNS") number and Commercial and Government Entity ("CAGE") code, with the Federal Awardee Performance and Integrity System ("FAPIIS") reflecting DynCorp's new immediate owner. AR 4. The Contracting Officer ("CO") stated that the awardee "is continuing operations as a separate entity" with "no indication that this new ownership changes [DynCorp's] corporate structure or will have any impact on its ability to perform as proposed." AR 4; *see also* AR 3516.

On January 22, 2021, the SSA determined DynCorp represented the best value to the Government in the Source Selection Decision Document ("SSDD"). AR 3464. The SSA's determination was made based on a review of the Technical Evaluation Team Report ("TET Report"); the Cost Evaluation Team Report ("CET Report"); the SSA Briefing on December 16,

4

2020; and the SSA's individual assessment. AR 3464. On January 28, 2021, the Agency notified PAE that DynCorp was the successful awardee. AR 3835.

### C.      Procedural History

On June 14, 2021, PAE filed its Complaint with this Court alleging that the Agency committed the following errors: (1) improperly downgraded PAE's proposal for planned labor efficiencies; (2) improperly adjusted PAE's cost proposal; (3) failed to find DynCorp's proposal deficient due to DynCorp's change in corporate ownership; (4) failed to amend the Solicitation to reflect changes; and (5) conducted an arbitrary and capricious best-value determination. *See* Compl. at 21–22; 25–26.[3]

On June 28, 2021, defendant filed the Administrative Record. *See* AR, ECF No. 26. On July 8, 2021, plaintiff filed a Motion to Supplement the Administrative Record. *See* Plaintiff's Motion to Supplement the Administrative Record, ECF No. 34. On August 2, 2021, defendant and defendant-intervenor filed their respective responses to plaintiff's Motion to Supplement the Administrative Record. *See* Defendant's Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record and Conduct Discovery, ECF No. 47; *see also* Defendant-Intervenor's Opposition to Plaintiff's Motion to Supplement the Administrative Record, ECF No. 45. On August 6, 2021, plaintiff filed a Motion to Supplement the Court's Record. *See* Motion to Supplement the Record Before the Court, ECF No. 51.

On August 6, 2021, plaintiff filed their Motion for Judgment on the Administrative Record. *See generally* Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 52 [hereinafter Pl.'s MJAR]. On August 12, 2021 the Court issued an Order denying plaintiff's Motion to Supplement the Administrative Record. *See* Order Denying Plaintiff's Motion to Supplement the Administrative Record, ECF. No. 57. On August 20, 2021, defendant and defendant-intervenor filed their respective responses to Plaintiff's Motion for Judgment on the Administrative Record and their cross-motions. *See generally* Defendant's Response in Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Cross-Motion for Judgment on the Administrative Record, ECF No. 60 [hereinafter Def.'s CMJAR]; Defendant-Intervenor's Response in Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record, ECF No. 61 [hereinafter Def.-Int.'s CMJAR].

On August 26, 2021, plaintiff filed its Reply and Response to defendant's and defendant-intervenor's Cross-Motions. *See* Plaintiff's Response to Defendant's and Defendant-Intervenor's Motions for Judgement on the Administrative Record, ECF No. 64 [hereinafter Pl.'s Resp.]. On September 1, 2021, defendant and defendant-intervenor filed their respective Replies. *See generally* Defendant's Reply in Support of its Cross-Motion for Judgment Upon the Administrative Record, ECF No. 66 [hereinafter Def.'s Reply]; Defendant-Intervenor's Reply in Support of its Cross-Motion for Judgment on the Administrative Record, ECF No. 65 [hereinafter Def.-Int.'s Reply].

---

[3] As stated in the previous footnote, plaintiff withdrew Counts 1 and 4 of their Complaint. Plaintiff's Motion for Judgment on the Administrative Record, at 1 n.1. Count 7 was dismissed. *Id*.; *see generally* Order on Motion to Dismiss, ECF No. 56.

5

On September 8, 2021, the Court held oral argument. On September 14, 2021, the Court issued an Order granting plaintiff's Motion to Supplement the Court's Record. *See* Order Granting Plaintiff's Motion to Supplement the Record, ECF No. 69. On September 15, 2021, the Court issued a ruling on the parties' cross-motions with judgment stayed pending issuance of the Court's written opinion. *See* September 15, 2021 Order, ECF No. 70. This is that Opinion. The parties' cross-motions are fully briefed and ripe for review.

## II.   Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which affords this Court with jurisdiction over bid protest actions. 28 U.S.C. § 1491(b). This Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for agency actions. *See* 28 U.S.C. § 1491(b)(4); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Under APA standards, agency procurement actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706 (incorporated in 28 U.S.C. § 1491(b)(4)).

In other words, "a bid protest may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332. Under the rational basis ground, the Court recognizes that "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id.* (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). Accordingly, the test for courts is whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion" where the protester has a "heavy burden" to show that the award decision has no rational basis. *Impresa*, 238 F.3d at 1332–33 (internal citations omitted). When a challenge is brought on the second ground, the protestor must show that the alleged violation was "clear and prejudicial." *Id.* at 1333.

The Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)). "If the court finds a reasonable basis for [an] agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). The court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment on the administrative record to request that the Court assess whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review. *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006)). On such a motion, the parties are limited to

the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record. R. Ct. Fed. Cl. 52.1; *Bannum, Inc.*, 404 F.3d at 1354. The Court will then determine whether a party has met its burden of proof based on the evidence in the record. *Bannum*, 404 F.3d at 1355.

### III. Discussion

#### A. The Agency's Evaluation under Factor 1

Plaintiff challenges the Agency's award to DynCorp, arguing that the Agency improperly evaluated PAE's proposal regarding its planned labor efficiencies and its Cost Proposal; improperly evaluated DynCorp's change in corporate ownership; failed to amend the Solicitation; and failed to conduct a best-value determination. *See generally* Pl.'s MJAR. Defendant and defendant-intervenor respond that the Agency properly (1) assigned PAE a weakness for its reduction in aircraft mechanic and aircraft mechanic supervisor labor, (2) rejected PAE's proposed escalation rates, (3) considered DynCorp's ownership change, (4) determined its requirements; and (5) conducted a best-value determination. *See generally* Def.'s CMJAR; *see also* Def.-Int.'s CMJAR.

##### 1. Assignment of Weakness for Labor Reduction

As described above, the standard under which this Court reviews bid protests is set forth under the APA. 28 U.S.C. § 1491 (b)(4); *see also Impresa*, 238 F.3d at 1332. Under APA standards, agency procurement actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706 (incorporated in 28 U.S.C. § 1491(b)(4)). "An agency's decision meets this standard when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Clarke Health Care Prods. v. United States*, 149 Fed. Cl. 440, 445 (2020) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). As part of this determination, the Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (internal citations omitted).

Plaintiff argues that the Agency improperly evaluated PAE's proposal when it assigned a weakness for anticipated labor efficiencies in OY 3-9 for the Mechanic labor categories ("LCATs") full-time equivalent workers ("FTE"). Pl.'s MJAR at 7. Plaintiff argues that the plain language of its proposal does not support the Agency's assigned weakness and increased Risk rating. *See id.* at 8–11. In response, defendant and defendant-intervenor argue that PAE reduced labor for OY 3–9 without providing the Agency with information on how it would achieve these efficiencies. *See* Def.'s CMJAR at 8–12; *see also* Def.-Int.'s CMJAR at 13–16.

After careful review of the record, the Court finds that the Agency provided a coherent and reasonable explanation of its exercise of discretion for its evaluation of PAE's proposed labor efficiencies and its assignment of a weakness. PAE's FPR addresses its labor efficiencies in two different sections. *See* AR 1486–87; AR 1491. Within the first section, PAE states that it has identified "a number of out-year efficiencies realized through the combination of applying

7

similar techniques and procedures employed elsewhere and technology implementation." AR 1486.  PAE states that it will apply lessons learned and best practices from the Continuous Improvement ("CI") Office to achieve efficiencies in labor aviation maintenance personnel and maintenance supervisors, realized through "standardizing site layout, reorganizing work spaces, pre-positioning common use tools, digitizing forms and records and maximizing support office access (i.e. technical supply, tool room, GSE yard)." AR 1486.

Within the second section, PAE provides additional details on its staffing efficiencies, stating in relevant part:

- PAE employs a robust [CI] Office headed by a Lean Six Sigma Black Belt qualified PhD. The techniques, procedures and efficiencies realized on dozens of programs across the PAE portfolio are brought to bear on the [Customs and Border Protection] Program.

    . . .

- Our experience as the incumbent indicates that we can realize efficiencies based upon historical adjustments. Rather than apply efficiencies too aggressively and thus create union labor relations issues such as work slow-downs, we chose the following factors to increase our efficiency in the Base Year and all Option Years:
    - Learning curve improvement of cycle times-work routines, e.g. as employees perform and learn or a task become repetitive.
    - Best practices/CI process implementation, e.g., improvements made at our other aviation contracts generate improvements on the CBP program.
    - Maximize cross-utilization were possible reduces redundancy in staff requirements
    - Value engineering changes/proposal makes it possible to implement and save work fostered from new ideas, procedures, steps and/or routines similar to a suggestion box.
    - Warranty improvements for Line Replaceable Units (LRUs)/parts.
    - PAE acknowledges Smart Aviation technology will be a part of this fleet within the life of the new contract and has developed strategic partnerships with aircraft OEMs and Smart technology firms including Microsoft and Dell that enable PAE to achieve Predictive Maintenance (PdM) capabilities improving maintenance efficiency and effectiveness. Smart technology/PdM implementation will enable PAE to shift a large percentage of unscheduled to scheduled maintenance reducing costs and increasing mission capability at no risk (non-radiating technology, with no security risks).
- The powerful combination of PAE's robust CI program under the leadership of a PhD; lessons learned from the successful execution of over $2B worth of diverse programs; and the effective integration of technological advancements, will allow us to gleen efficiencies in operations and realize significant cost savings over time across the program.

AR 1491.

On review of these two sections within PAE's FPR, the TET Report notes its concerns with *how* PAE could realize its proposed efficiencies:

> PAE's description of gaining [Continuous Process Improvements ("CPI")] efficiencies through "standardizing site layout, reorganizing work spaces, pre-positioning common use tools, digitizing forms and records, and maximizing support office access []" does not explain how these changes will enable PAE to reduce its aircraft mechanics 19.52 FTEs and 2.00 maintenance supervisors in the out years []. Nor does PAE explain how the same volume of aircraft maintenance requirements (based on the same number of flight hours, number of aircraft, and number of sites) will be accomplished with 19.52 fewer aircraft mechanics and 2.00 fewer maintenance supervisors in Option Years 3-9.

AR 3299 (emphasis omitted); *see also* AR 8. The TET Report states that "PAE does not specify where these techniques and procedures were employed and how they were able to reduce staffing based on CPI efficiencies, specifically reducing aircraft mechanics at the levels proposed." AR 3299. Simply put, the Agency's TET Report shows that it evaluated PAE's proposal regarding these efficiencies, but it could not discern *how* PAE would reduce its workload and still meet the requirements of the Solicitation with fewer aircraft mechanics and maintenance supervisors. *See* AR 3299; *see also* AR 7–9.

Further, the TET Report shows that the Agency was not only concerned with *how* PAE would achieve its proposed labor efficiencies but whether these efficiencies would introduce problems with performance and safety. *See* AR 3299. The TET Report notes that with 211 aircraft across 34 locations, eliminating 19.52 aircraft mechanics and 2.00 maintenance supervisors would "introduce performance, safety, and scheduling issues." AR 3299. The TET states that "the mission requirements and operational tempo . . . will be unable to be attained if aircraft cannot be maintained in a timely manner (due to aircraft being grounded and/or delayed while they await required maintenance)." AR 3299. Finally, the TET Report notes a "concern over maintaining proper quality control of work stemming from fewer aircraft mechanics [], which potentially introduces performance and safety errors." AR 3299. Accordingly, the Agency assigned a weakness to PAE's proposal for performance and safety reasons. *See* AR 3299.

Given the record, the Court is unconvinced that the Agency committed an error in its evaluation. Rather, the Agency provided a rational and coherent explanation of its decision to assign a weakness to PAE's proposal. The Agency evaluated PAE's proposal and assigned it a weakness due to various concerns over PAE's reduced staffing approach. *See* AR 3298–99. Specifically, the Agency assigned PAE's proposal a weakness because it could not determine *how* it would achieve its proposed efficiencies and whether those efficiencies would introduce performance and safety issues. *See* AR 3298–99. The Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc.*, 419 U.S. at 285–86; *Honeywell, Inc.*, 870 F.2d at 648 (where a court "finds a reasonable basis for [an] agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."). Thus, the Court finds nothing in the Administrative Record

9

which would support finding the Agency's assignment of a weakness as arbitrary or capricious, an abuse of discretion or otherwise not in accordance with the law.

### 2. Clarification

FAR 15.306(a) defines clarifications as "limited exchanges" which give offerors "the opportunity to clarify certain aspects of proposals" or to "resolve minor or clerical errors." Federal Acquisition Regulation 15.306(a). "Importantly, however, '[c]larifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal.'" *ManTech Advanced Sys. Int'l v. United States*, 141 Fed. Cl. 493, 507 (2019) (citing *Dell Fed'l Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018)). In other words, clarifications "may not provide new information or alter already provided information." *ManTech*, 141 Fed. Cl. at 507 (citing *Level 3 Commc'ns, LLC v. United States*, 129 Fed. Cl. 487, 504-05 (2013)).

PAE argues that the Agency interpreted its labor efficiencies as an absolute intention to reduce personnel in OY 3-9 versus a condition precedent to staffing reductions. *See* Pl.'s MJAR at 11. According to PAE, the Agency's interpretation was a misunderstanding that could have been cleared up through clarifications. *Id*. at 15–16 ("[T]he misunderstanding that [the Agency] suddenly seized on during re-evaluation could have been resolved by a simple question: did PAE intend to permanently cut its maintenance personnel whether or not PAE achieved the efficiencies it anticipated in its proposal?"). Defendant asserts that plaintiff's proposal "did not indicate that the proposed labor reductions were contingent in any manner" but instead affirmed that the efficiencies would result in reductions to aviation maintenance personnel and maintenance supervisors. Def.'s CMJAR at 10. Further, defendant argues that if the Agency proceeded with clarifications on PAE's intentions for reducing aircraft mechanic labor, it "would have gone beyond what is permitted within the bounds of clarifications." *Id*. at 15. Defendant-intervenor argues much the same, stating that at a minimum plaintiff would "need to either provide new language indicating its intended 'condition,' or provide additional justification and rationale for the proposed staffing cuts." Def.-Int.'s CMJAR at 20.

The Court agrees with defendants. Plaintiff's proposal was fundamentally unclear. As argued above, the TET Report supports that the technical team assigned PAE's proposal with a weakness due to PAE's insufficient explanation of its labor reduction—a weakness which presented questions of performance and safety. *See* AR 3298–99. Indeed, the record supports that the Agency would have needed substantive conversations with plaintiff regarding its ability to meet the Solicitation's terms—regardless of whether the labor reductions for Mechanic LCATS FTEs were conditional on plaintiff achieving certain efficiencies—and this would have required a proposal revision. *See* AR 3298–99.

Further, the question which plaintiff argues the Agency should have asked—did PAE intend to permanently cut its maintenance personnel whether or not PAE achieved the efficiencies it anticipated in its proposal—would have at a minimum led to revisions of its cost proposal. *See* Def.'s CMJAR at 15. In other words, PAE would have had to change its cost proposal to reflect revisions to its labor if its efficiencies were not realized. *See id*. For example, PAE would have had to revise portions of its final proposal revision—Appendix D (Schedule) and Appendix E (Volume I: Business Management Information)—which would have gone

beyond the scope of a clarification. *See* AR 1731; *see also* AR 2234. Accordingly, the record shows that any question regarding the conditionality of PAE's proposed labor reductions would have resulted in revisions to its proposal. *ManTech*, 141 Fed. Cl. at 507 (stating that "[c]larifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal.") (internal citations omitted). Therefore, the Agency's decision not to engage in clarifications was rational and is supported by the record.

### 3. Assignment of Weakness and Adjusting the Most Probable Cost

Plaintiff next argues the Agency erred by "double counting" the technical weakness assigned to plaintiff's proposed mechanic-FTE reductions in OY 3-9. Compl. at 16; Pl.'s MJAR at 13–15. Specifically, plaintiff argues that by upwardly adjusting plaintiff's Most Probable Cost ("MPC") estimate to reflect the scenario in which the option-year staffing reductions *do not* occur, the Agency essentially "erased" PAE's technical weakness, yet still penalized PAE by assigning a weakness. Pl.'s Resp. at 5. Plaintiff argues that the agency can only do this if it first concludes that the offeror failed in some way to understand the requirements of the solicitation. Pl.'s MJAR at 14 *(citing Westech Int'l, Inc. v. United States,* 79 Fed. Cl. 272, 298–99 (2007)). In response, defendant and defendant-intervenor argue that the Agency's MPC calculation and technical evaluation are distinctly separate. *See* Def.'s CMJAR at 13–14; Def.-Int.'s CMJAR at 18–19. Defendant-intervenor argues that the "risks" associated with plaintiff's staffing reductions are "distinct" from the Agency's cost adjustment and represent performance, quality, and safety risks. *See* Def.-Int.'s CMJAR at 19; *see also* Def.-Int.'s Reply at 8. As such, these perceived risks remain—even if PAE's cost is adjusted to reflect a realistic cost estimate and a scenario in which plaintiff's proposed labor reductions do not occur. Def.-Int.'s Reply at 8.

The Court is unconvinced by plaintiff's arguments. Plaintiff primarily relies on *Westech* which is not applicable to the facts here. Pl.'s MJAR at 14 (citing *Westech*, 79 Fed. Cl. at 298–99). In *Westech*, the solicitation explicitly prescribed that the agency may reevaluate a technical proposal following an MPC adjustment if based on an offeror's misunderstanding of the SOW requirements. *See id.* at 299 (holding that it was within the Agency's discretion to reevaluate technical proposals and downgrade an offeror's technical score based on the Agency's belief that the offeror's proposal "did not reflect a clear understanding of the [Statement of Work] requirements."). Unlike *Westech*, the Solicitation here does not state that the Agency will reevaluate a technical proposal after upwardly adjusting an offeror's MPC, nor does the Court read *Westech* to require such a reevaluation of technical proposals in *all* solicitations. *See generally* AR 29 (Solicitation); *cf. Westech Int'l,* 79 Fed. Cl. 298. Ultimately, the Agency had a rational basis to conclude that plaintiff's staffing reductions presented a medium risk to contract completion during its technical review and adjusted PAE's cost proposal to reflect a realistic cost estimate during its cost evaluation. AR at 3299 (stating that the most likely cost scenario is one in which plaintiff's projected efficiencies and associated reductions are not realized.). Therefore, the Agency acted neither arbitrary or capricious, abused its discretion or otherwise acted not in accordance with the law.

### 4. Unequal Treatment

Plaintiff also argues the Agency was unequal in its evaluation of its labor proposal in comparison to DynCorp's proposal under Factor 1. Pl.'s MJAR at 16–19. Plaintiff asserts that because it "proposed far more [mechanic] labor hours" and "Mechanic LCAT FTEs" than DynCorp, the Agency acted irrationally by assigning plaintiff's labor proposal a weakness and DynCorp's proposal a strength. Compl. at 17; Pl.'s MJAR at 17. In response, defendant and defendant-intervenor argue that plaintiff has not met the high standard to establish unequal treatment, as "PAE's and DynCorp's respective evaluations are not 'substantially indistinguishable.'" Def.'s CMJAR at 17 (citing *Office Design Group*, 951 F.3d 1366, 1372 (Fed. Cir. 2020)); Def.-Int.'s CMJAR at 21. Defendant argues that the parties proposed different strategies for staffing its aircraft mechanic positions and that these "*substantive* differences" are material to plaintiff's disparate treatment allegation. Def.'s Reply at 6 (emphasis in original).

It is axiomatic that "a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 383 (2003) (internal citations omitted). To prevail on a claim for unequal treatment, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals," or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Office Design Grp.*, 951 F.3d at 1372; *see also Taahut v. United States*, 849 F. App'x 260, 267 (Fed. Cir. 2021). A court must dismiss a claim if the protester does not meet this standard because "[t]o allow otherwise would give a court free reign [sic] to second-guess the agency's discretionary determinations underlying its technical ratings." *Office Design Grp.*, 951 F.3d at 1373.

Plaintiff fails to demonstrate that the Agency treated the proposals unequally. The crux of plaintiff's argument is that because plaintiff proposed *more* mechanic FTEs and labor hours than DynCorp, the Agency cannot rationally assign plaintiff's labor proposal with a weakness while assigning DynCorp's proposal a strength. Pl.'s Resp. at 6–7. But this argument misconstrues the standard for an unequal treatment claim. Here, the parties' approaches to staffing mechanics are fundamentally different: DynCorp proposed to maintain a constant number of mechanic FTEs over the life of the contract, while plaintiff proposed a staffing reduction in OY 3-9, due to anticipated operational efficiencies. AR 3980–81; AR 1376-83; AR 3299. The Agency had a rational basis to conclude that plaintiff might be unsuccessful in achieving the reductions in its staffing proposal without affecting operations, which could jeopardize contract completion. *See* AR 3299. Although plaintiff proposes more mechanics than defendant-intervenor in *total*, both offerors had substantively different approaches regarding labor. As such, the Court declines to find fault in the Agency's discretionary assignment of a weakness to plaintiff's proposal while assigning a strength to DynCorp's proposal.

### B.   DynCorp's Ownership Change

Plaintiff argues that the Agency had an obligation to meaningfully evaluate the impact of DynCorp's sale to Amentum. *See* Pl.'s MJAR at 21–27. Plaintiff asserts that DynCorp's sale was a "material change" to DynCorp's proposal, impacting its cost and technical approach. *See*

*id*. at 23–25.  Defendant responds that the Agency considered DynCorp's sale and rationally determined that DynCorp's performance will not be impacted.  Def.'s CMJAR at 27. Specifically, defendant asserts that the Agency examined DynCorp's sale and "found that it had no material impact on DynCorp's proposal."  *Id*. at 28.  Defendant-intervenor responded with much the same, arguing that DynCorp's change in ownership did not materially affect DynCorp's corporate identity or its proposed cost or technical approach.  Def.-Int.'s CMJAR at 8–13.

The Court is unconvinced by plaintiff's arguments.  The record supports that the Agency considered DynCorp's change in ownership and found that the acquisition had no material impact on DynCorp's proposal.  *See* AR 3516–17; *see also* AR 5605.  The Agency acknowledged DynCorp's ownership change and documented that the contract specialist "conducted a search of [] DynCorp's DUNS and CAGE code in SAM.gov and FAPIIS systems." AR 3516.  The Agency concluded that "[b]y all indications, DynCorp is continuing operations as a separate entity and there is no indication that this new ownership changes DynCorp's corporate structure or will have any impact on its ability to perform as proposed." AR 3516–17; *cf. NetCentrics Corp. v. United States*, 145 Fed. Cl. 158, 169 (2019) (holding a material misrepresentation occurred when the offeror misrepresented the availability of key personnel).

Plaintiff presents no credible evidence or argument to supports its assertion that DynCorp's ownership change had a material impact on DynCorp's cost or technical approach in such a way that DynCorp's proposal contains a material misrepresentation.  *See generally* Pl.'s MJAR; *but cf. NetCentrics*, 145 Fed. Cl. at 169 (stating that a material representation requires that the agency relied on a false statement to favorably evaluate the offeror's proposal) (internal citations omitted).  Rather, the record supports that DynCorp remains intact with the same resources reflected in its proposal.  In other words, there is nothing in the record to support that DynCorp submitted a proposal with false information or that which would require a revision to its technical or cost approach.  In that regard, this Court agrees with defendant and defendant-intervenor and finds that the Agency acted rationally in its evaluation of DynCorp.

### C.   PAE's Escalation Rates

Plaintiff argues that the Agency conducted an arbitrary and capricious cost-realism analysis when it upwardly adjusted PAE's cost proposal.  Pl.'s MJAR at 27.  Plaintiff contends that the Agency improperly rejected its "unique cost escalation rates and replaced them with a standard escalation rate not contained in the Solicitation."  *Id*. at 27–28.  Defendant contends that the Agency's rejection of PAE's escalation rates and its replacement with a government estimated rate (i.e., the Global Insight rate[4]) was rational as PAE did not follow the Solicitation

---

[4] "The [Cost Evaluation Team] used Global Insight as a basis to determine whether the proposed escalation rates are reasonable and realistic. Global Insight is the standard escalation tool that [Defense Contract Audit Agency] uses in their audit findings.  Global Insight is one of the leaders in market and escalation data in the industry with almost 4,000 clients.  DCAA provided [the Agency] Global Insight escalation rate[s] for each option period using the Professional Technical Services in the Aviation Maintenance & Support industry index (mid-point) for [Cost-plus incentive fee] only with comparison to each offeror's proposed escalation rates and related escalation evaluations []."  Administrative Record 3374.

or provide an adequate explanation for its proposed rates. *See* Def.'s CMJAR at 19–24. Similarly, defendant-intervenor argue that the Agency had a rational basis for making probable cost adjustments in the option years. Def.-Int.'s CMJAR at 22–27.

"[C]ontracting agencies enjoy wide latitude in conducting the cost realism analysis." *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020) (citing *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 211 (2019) ("It is well established that contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a particular methodology in a solicitation.")). To successfully challenge a cost realism analysis, a protestor must demonstrate "the absence of a rational basis for the agency's decision." *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 429 (2016) (internal citation omitted) (internal quotation omitted). When reviewing an agency's cost realism determination, "the Court defers to those agency conclusions that are rational and based on reasoned judgment." *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 329 (2003).

The Solicitation instructed offerors to provide a price for the base year and "apply the escalation and/or de-escalation factor(s) proposed" for each Option Year. AR 1146 (Amendment 10). In other words, the Solicitation requested offerors to provide escalation rates to price out their option years. *See* AR 1146–47. Importantly, the Solicitation instructed offerors that they "shall have *adequate supporting documentation* to include the rationale of how the factor(s) was determined as the factor(s) proposed will be evaluated." AR 1146 (emphasis added). Offerors were required to provide these escalation rates in the associated pricing attachments, Attachments 6A, 6B, and 6C—"using Excel with all formulas intact" and to "propose[] their escalation factors and provide rationale for the factor." AR 1173–76. The Agency specifically noted that it will "evaluate proposed escalation rates for reasonableness in comparison to industry contract escalation standards and the rationale provided to support the proposed rates." AR 1225 (Amendment 12). The Agency instructed offerors to explain "any proposed escalation rates that are below historical wage escalation levels or any unique circumstances involving the proposed escalation rates." AR 1225.

Plaintiff proposed escalation rates by location within the Statement of Work ("SOW") for each period of performance. AR 1487. On review, the CET found that the "escalation rates for each year by site seemed random" and that PAE "did not provide adequate support and rationale for their proposed escalation rates, because the narrative did not explain how the escalation rates were calculated." AR 3444. The CET could not determine if the proposed escalation rates were "based on a practical approach." AR 3444. Additionally, the CET Report states that the evaluators noticed "significant" differences between PAE's proposed escalation rates and the Global Insight rate. AR 3444. As a result, the Agency adjusted PAE's escalation rates upward to the Global Insight rate for option years one through nine to reflect a "reasonable and realistic escalation rate for each of the option periods." AR 3444.

The Court finds that the Agency acted rationally when it adjusted PAE's cost proposal. PAE explained that its proposed escalation rates "allow[] for greater fidelity of proposed costs as it incorporates salary escalation for exempt staffing, the impacts of outyear staffing efficiencies at specific locations, and the application of PAE indirect rates and profit/fee." AR 1519.

However, PAE's explanation shed little light on how plaintiff calculated its rates or why they varied to such a degree—for example, an escalation rate of ▮▮▮% for Option Year 2 and a ▮▮▮▮▮▮▮% for Option Year 3 at the Bellingham Air Branch, Washington location. AR 1789. Indeed, the Agency reviewed PAE's submitted rates but could not determine the rationale behind these varying rates or how they were calculated. *See* AR 3444. Further, the Agency noted that PAE's proposed rates were much lower than the government estimate rate from Global Insight. AR 3444. As such, the CET recommended an adjustment to PAE's proposed escalation rates to reflect reasonable and realistic escalation rates. AR 3444. Given the record, the Agency acted rationally and was neither arbitrary nor capricious in its determination to adjust PAE's cost proposal.

### D. Amendment to the Solicitation

Plaintiff argues that the Solicitation no longer reflects the Agency's needs because "the level of effort on the incumbent [] contract in 2020 and 2021 do not reflect the level of effort solicited under the 2018 RFP." Pl.'s MJAR at 31–32. Plaintiff argues that the Agency "abuses its discretion when it awards a contract with the intention of materially modifying it after award." *Id*. (citing *MVM, Inc. v. United States*, 46 Fed. Cl. 137 (2000)). In response, defendant argues that this is a contract that is "almost exclusively cost-reimbursement" and that is because the Agency cannot predict "when and where it will need to conduct missions requiring aircraft years in advance." Def.'s CMJAR at 24. Defendant argues that the Solicitation anticipated dramatic surges, stating that "[t]he number of flying hours will vary by aircraft, location, and mission requirement and *may dramatically increase or decrease or surge* in response to border protection priorities." *Id*. Similarly, defendant-intervenor argues that the Solicitation anticipated "annual, mission-driven fluctuations to flights hours, and attendant/derivative maintenance needs, and it specifically built in flexibility so that the Agency could adjust projected annual flight hours as needed, depending on present mission requirements." Def.-Int.'s CMJAR at 29.

The record supports defendant's and defendant-intervenor's position. The Solicitation SOW specifically warns offerors that flying hours "may dramatically increase or decrease or surge in response to border protection priorities." AR 335. As such, the record supports that the Agency expects that flying hours may have a *dramatic increase*, such as the increase noted by PAE in the incumbent contract. *See* Pl.'s MJAR at 32 (stating that "in 2020, PAE's performance of the NAMLS bridge contract required ▮▮▮▮▮▮ total labor hours across all CLINs" which is a "▮▮% increase in labor hours compared to the scope anticipated in the RFP."). Moreover, the record supports that the Agency contemplated mission-driven fluctuations to flights hours because it stated that it would "review the Aircraft Laydown and Flying Hours [] for each Option Year and renegotiate the contract year, as needed, based on requirements accordingly." AR 1146. Thus, the Agency did not abuse its discretion by not amending the Solicitation; rather, the Agency acted rationally because the Agency's underlying requirements did not change.

### E. Best Value Determination

Plaintiff contends that the Agency departed from the terms of the Solicitation and law "by downgrading PAE's technical score based on an erroneous assessment of PAE's proposed efficiency-based reduction of Mechanic LCAT FTEs." Pl.'s MJAR at 30–31. Plaintiff argues that the Agency allowed DynCorp to "avoid disclosing" its change in ownership and "failed to

15

meaningfully assess the impacts from that transaction on DynCorp's proposal." *Id*. at 31. Finally, plaintiff argues that the Agency replaced PAE's unique escalation rates with the government-estimate rate "which resulted in a far larger upward adjustment to PAE's MPC than to DynCorp's MPC." *Id*. Given these errors, plaintiff argues that the Agency conducted an arbitrary and capricious best value tradeoff determination. *Id*. Defendant argues that plaintiff simply disagrees with the Agency's award decision but has not established that the Agency committed any error in the evaluation. *See* Def.'s CMJAR at 32–33. Defendant-intervenor argues that the record provides a "reasonable, well-supported basis for the Agency's source selection decision" and that there were no errors with the cost and technical evaluations. *Id.* at 28.

Agencies have "substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (internal citations omitted). In fact, contracts awarded on the basis of best value afford the contracting officer with "even greater discretion than if the contract were to have been awarded on the basis of cost alone." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). Agencies must "examine the relevant data and articulate a 'satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Spectrum Comm., Inc. v. United States*, 126 Fed. Cl. 778, 792 (2016) (internal citations omitted). "[C]ourts have repeatedly observed, the greater the procurement official's vested discretion, the higher the threshold for finding the official's decision irrational or otherwise unlawful." *PlanetSpace Inc. v. United* States, 96 Fed. Cl. 119, 125 (2010) (internal citations omitted). Thus, "[a]n agency's contract award is [] least vulnerable to challenge when based upon a best value determination." *Id*. (internal citation omitted).

After a comprehensive review of the record, the Court finds the Agency's award to be reasonable. Plaintiff's argument challenges the Agency's evaluation of PAE's technical and cost proposal. However, the record does not support that the Agency committed any error in its evaluation of PAE's proposal. As argued above, the record demonstrates that the Agency rationally considered the efficiencies proposed—the reduction of aircraft mechanic and aircraft mechanic supervisor labor—but determined that PAE did not provide the Agency with adequate explanation on how these efficiencies would be achieved and whether these efficiencies would cause safety and performance issues. *See* AR 3299; *see also* AR 7–9. Further, the record shows that the Agency considered DynCorp's change in ownership and found that the acquisition had no material impact on DynCorp's proposal. *See* AR 3516–17; s*ee also* AR 5605. Finally, the record supports that the Agency acted rationally when it adjusted PAE's cost proposal. *See* AR 3444. Therefore, the Court finds the Agency's documentation of its trade-off analysis demonstrates a proper exercise of discretion within the terms of the Solicitation.

### F.     Injunctive Relief

This Court is generally loath to "disturb a best-value award so long as the agency 'documents its final award decision and includes the rationale for any business judgments and tradeoffs made.'" *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 360 (2009) (quoting *Blackwater Lodge & Training Ctr. v. United States*, 86 Fed. Cl. 488, 514 (2009))

(internal citation omitted). So long as there exists a "rational connection between the facts found and the choice made," the Court will not set a procurement decision aside. *Banknote Corp. of Am.*, 56 Fed. Cl. at 390 (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43). As the Court is not persuaded by plaintiff's contentions that the Agency conducted a flawed evaluation and award, the Court does not believe that plaintiff was prejudiced by such alleged procurement flaws.

Finally, plaintiff alleges that it is entitled to permanent injunctive relief. Pl.'s MJAR at 34–35. When analyzing whether permanent injunction is proper, a court must analyze "whether, as it must, the plaintiff has succeeded on the merits of the case." *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004). As plaintiff has not succeeded on the merits of its case, the Court will not grant injunctive relief.

## IV.   Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is hereby **DENIED**. Defendant's and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are hereby **GRANTED**. The Clerk is directed to enter judgment in favor of defendant and defendant-intervenor, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge